I guess not. Okay, we're flattered. So, third case up, 22-30055 Paquemines Parish v. the State of Louisiana. Oh, we got a home case. So, okay, nobody had to travel too far to get here. So, all right, Mr. Case, we're ready for you. Thank you, Your Honor, and may it please the Court. This case turns on the unique and temporary relationship that the federal government established with these defendants during World War II. The military required an unprecedented increase. Just keep your voice up a bit. I think you can be heard, but just to be sure so they can hear. I see some people out there kind of leaning in, so just keep your voice up good and loud. Yes, Your Honor. The military required a massive increase in oil production at a time when steel and other equipment materials were scarce and had to be rationed, and the government recognized that its critical needs would not be met if industry were left to private competition and management. So it established a new agency, the Petroleum Administration for War, which to execute its mission assembled the companies into joint committees that would be integrated into the government and work under Paul, and in an unprecedented step, one that has never been repeated since, the government formally exempted those companies and their committees from the antitrust laws precisely so they could operate in coordinated fashion under Paul and help the government manage the wartime petroleum program. And using these committees as an extension of its own staff, Paul then issued production quotas, which required increases in output. It controlled the materials the companies were allowed to use, and it issued directives that said what methods of production would be permissible. That is an acting under relationship under the Supreme Court's decision in Watson. Mr. Weisler, I have a couple of questions. The first one is, how does our recent decision in Glenn v. Tyson Foods affect your analysis, and how would you distinguish it? That's one question. And the second one, assuming that we agree with you that the oil producers are like subcontractors under the statutes and regulations, how does that help you if we don't see any indication in the record that the federal government exercised actual supervision or control? Thank you, Your Honor. Let me address both of those in sequence. So first, as to Tyson, Glenn v. Tyson, I think, illustrates why this case falls under the acting under category, because the two critical tests under Watson, the two parts of the test are, are you assisting the government in providing something the government needs, and are you doing so under its subjection, guidance, or control? So the central holding in Tyson was that Tyson wasn't being controlled in any way. Tyson was just facing government encouragement and exhortation, and there was nothing binding about what Tyson was subjected to. Here, it's exactly the opposite. And let me be very concrete, since Your Honor's second question, I think, also had as its premise that maybe all this was just voluntary and optional. Under the directives we've cited and relied on, it was a crime to willfully violate the materials conservation orders, and all of the directives we've cited were punishable and sanctionable if you disobeyed by having all of your materials taken away from you, which is the death sentence for a company operating in this business. And if I could refer, Your Honor, if you were to look at just one page in the record on this point, I'd ask you to look at page 13925. That's where J. Howard Marshall, who was the solicitor of Paul, described what he did when there was a recalcitrant operator early in the program who said he wouldn't abide by the programs. Marshall said it took him a day to take away that operator's materials. Within a few days, the operator came to him, he says, tailed between his legs and said he would obey the quotas, at which point Marshall responded with the two-word response, you better. And now, Your Honor, I think I asked in the last case about what constitutes a show of authority. That is as unmistakable a show of authority as one could imagine. It was clearly an exercise of control. There was nothing optional about it. And then to take the other aspect... Control or regulation? Well, it's not regulation, Your Honor. It's different from regulation in several respects, and in particular in the respect that Watson relied on to distinguish cases of acting under from cases of mere regulation. Watson said that the critical distinction was that acting under requires that the entity be helping the government to produce an item that the government needs. And in fact, specifically cited this Court's decision in Winters v. Diamond-Shamrock and said the core example was helping the government by providing an entity to conduct a war. And it distinguished the Philip Morris case and, for that matter, Judge Elrod's Tyson case, because those were companies that were just operating in the private sector. Tyson was one of the cells chickened to the consumers. Oil doesn't operate in the private sector? It does in some respects, but in this case, this oil was going to the military. This was an entity that was providing the government with a... That's some of the oil that was... That's right. That's right. And it was because that oil... It was still engaged in a private for-profit enterprise. That's right. And many entities operating, acting under federal officers are also simultaneously acting in a private capacity as well. They may have a government contract. They may have private contracts. The question is what do the activities at issue in the case focus on? And what was different about Tyson and Philip Morris is that all they were doing was selling their goods to consumers. So they had no relationship with the government at all other than the usual regulator-regulated relationship. This case is entirely different. When the Attorney General exempted these companies... Are you saying there was some pre-existing relationship with the government that makes this unique? Not pre-existing. The relationship... You mean other people had no relationship with the government, but the oil did? They had no... The other people, Tyson, Philip Morris, had no relationship with the government other than that of a normal regulated party. And what we're saying is that the government imposed a very different sort of relationship on these companies during World War II because the government needed their oil to carry out the governmental function of conducting the war. We were military suppliers, and for that purpose, and that's what is at issue in this case, for that purpose, we were acting under. And the examples I would give, which I think distinguish this case so much from those others... It may not be the exclusive purpose. It may not be the exclusive purpose, but this Court said in Savoy v. Huntington-Ingalls that if any part of a claim implicates the federal officer statute, the whole case goes up. So it's almost always the case, in any federal officer case, that the entity that is acting under for one purpose may not be acting under for other purposes. But as long as the claims in the case relate to the respects in which the entity was acting under, then the whole case goes up. And here I would refer, Your Honor, to the way the official government account of the Petroleum Administration for War's history describes the relationship. It said that these committees, these company committees consisting solely of company personnel acting on company time, functioned as extensions of the government agency such that, and this is a quote, it was all but impossible to tell where one left off and the other began. They said that these committees relieved the government of the need to create its own internal organization because the companies, and this is a quote, carried out under governmental supervision, pause, programs, and policies. And the Attorney General, when he issued the antitrust exemption, explained it in terms that echoes the Watson case exactly. He said this was a time of emergency and the antitrust exemption would apply because these companies were acting, quote, under public authority to promote public interest and not to achieve private ends. That's exactly what acting under is about. So the reason this isn't mere regulation, in addition to the fact that we were supplying the government with a good that it needed to conduct a war, which is quintessentially governmental, that's why so much of what happened here looks nothing like normal regulation. Lifting the antitrust laws is not normal regulation. It's the opposite of normal regulation. It's removing constraints. But they did it here so that we could operate in coordinated fashion under unified government direction, imposing production quotas. I don't know of any regulation that requires a manufacturer to produce more of its good and prohibits it from closing wells, which is what these regulations did. And that's why everything we have relied on in this case went away after World War II. Paul was disbanded. The antitrust exemption was lifted. All of these directors were removed. And what that left in place, that was what Watson would refer to as regulation. It's the stuff we're subjected to today. Environmental regulation, workplace safety, securities regulation, all that stuff. None of that makes us federal officers or acting under federal officers. But what happened during World War II was different because of the needs of the war and the unique posture the government took. And in that respect, I am cognizant of the fact that not only the Tyson case that Judge Elrod mentioned, but there have been other cases this last year before this court in which entities have made some highly attenuated claims of federal officer jurisdiction that the court properly rejected. This case is different because none of those cases involve committees of companies absorbed into the government bureaucracy, exempted from the antitrust laws, and all to help the government fight a war by providing an item that the  I want to move on to do what the plaintiffs are doing here, which is premise a claim on calling into question the lawfulness of what defendants did during World War II, 80 years ago. And the amicus brief that was submitted to this case by two former chairmen of the Joint Chiefs of Staff, who have no interest in the ultimate resolution of the merits case, but who filed this brief based on their history as retired military officers who served for decades across multiple administrations. And they say what happened here was unique. And so the court can, and of course we believe should, find removal proper here without in any way disturbing the prior precedents and other holdings of this court, because World War II and these companies' relationship to the government for that particular purpose was unique. And I'm sure you make this argument to Judge Feldman, right? Yes, Your Honor. And he alludes to the voluminous record, et cetera, et cetera. So precisely what was he missing in terms of this nexus to World War II, special relationship to the government this is different, et cetera. I'm trying to understand, qualitatively, is there a difference between what you are, I'm not saying because he did X, we do X, but I'm trying to figure, okay, what was he missing? Is there something different about what's in this record, the thrusting arguments, the purview that wasn't presented, you know, face on? What part of in his analysis, what did he miss? I would cite a couple. I mean, he obviously didn't have Tyson, I get that. And of course, it is de novo review. I know, I know, I'm just... I would cite a couple of things, Your Honor. First of all, in the course of his acting under analysis, the district court reimposed the very causal nexus test that this court on Bonk and Latchley had overruled. And this is on page 14 of the district court's decision. He said that this should be considered a case of mere regulation because we hadn't, he said, pointed to a direct command from the government to the defendants that they use leaking pits rather than steel tanks. That was the old causal nexus test where you had to identify a particular claimed act of wrongdoing from the plaintiff's complaint and match it up with a specific federal directive that said you had to do what they said you shouldn't have done. And yet, Judge, the district court reimposed that test in the course of his acting under analysis. That was the same mistake that was made in the second St. Charles Surgical Hospital case that this court decided earlier this year when it said it doesn't require acting under a precise directive of that sort. What it looks at is the overall relationship. And I would just emphasize, if one takes a step back, this really is precisely the kind of case and precisely the kind of relationship that the removal statute was meant to cover. I mentioned the brief from the retired military officers who said that these companies stepped up and supported the government and partnered with the military during what was perhaps the most profound national security challenge of the 20th century. And what the plaintiffs are claiming now is that we should have done exactly what the government was telling us we couldn't do. We should have slowed production. We should have used more steel and more asphalt to better protect the environment. And those were things we couldn't do because the government told us we couldn't when we were supplying the government with the oil it needed. So we have a very strong federal defense that arises directly out of our relationship with the government, our service to the government, and when we were acting under the government's direct supervision. And all we are asking is that we get to present that defense in a federal court rather than a state court. The plaintiffs will still have the opportunity to present all of their claims and all of their arguments to a neutral adjudicator, but we will have the opportunity to present that federal defense arising out of World War II in a federal court. And we think that is precisely what the federal officer removal statute contemplates. And if the court doesn't have any further questions at this time, I'll reserve the remaining time for rebuttal, if I may. That's fine. Thank you, sir. Mr. Marcello. May it please the Court, Your Honors. I'd like to first make one point that I think the defendants cannot overcome. I cannot distinguish the Tyson case from this case. And I'll give you the comparisons and answer Judge Elrod's question in detail. In Tyson, the government never packaged or in Tyson, the packaging and processing of chicken was never the task of a federal superior. In this case, the production of crude oil was never the task of a federal superior. During the pandemic, Tyson and the government worked closely with each other. During World War II, the oil industry worked closely with the government. The government helped Tyson procure products that it needed, personal protective equipment to do the inspections and to work and to keep their plants working. The government helped the oil companies here to get steel that they needed to produce oil and gas. Tyson had no government contract, no principal agent relationship or formal delegation from the government. The crude production, in this case, there was no contract for crude production, absolutely no delegation. And there's no mention in Mr. Tyson's argument about how this is not, how this case, how his case complies with the Watson case. So is it your position that in this case, the government wasn't saying we need to be supplied X amount of oil reserves, we need to keep that open, and we need to make sure you get that? Because I don't think that they were doing that in the chicken case, that they were saying the government needs to get so many chickens, and that's really important for our war, for our effort. Your Honor, that has been the driving argument. That has been the main argument that has been made from the beginning, that somehow we have to meet quotas. The government never forced an oil company during World War II to meet any quotas. Those quotas were merely, merely what are called allowables that are used in every state that produces oil except California. I think he just told a very poignant story about J. Howard Marshall calling someone in and saying you're going to be cut off at the knees from doing this business if you don't keep up with your quota. I mean, is that in this record or not? Yeah, that is in this record, and everything else in this record, government documents, the recommendations, the regulations, tell another story. Poignant is probably not the right term, but it had a lot of details to it. Yeah, well, J. Howard Marshall, as you know, is a very interesting character with his relationship with Anna Nicole, but... No, I'm not even talking about that. I'm just talking about can he, did he call people in and say you didn't meet your production and you're going to be not part of this deal and we're going to make sure you don't get to supply any oil if you don't get to keeping with our numbers. I'm sure that's an apocryphal story. It's in this record. It's in the record, and it's one item in a deposition from a person who was a solicitor of the PAW at the time, and what he was talking about was enforcing a regulation. There was nothing that forced anybody to do anything. Well, normally that would be a violation of antitrust laws and perhaps some other laws, but that was overridden in this case. It's actually dictate to people, you're going to do X, you're going to do Y. Well, he worked for the government. He did come out of industry, but the antitrust laws were actually relaxed during the war, which actually helped the oil companies. That's what we're saying, that you wouldn't normally be able to say you're going to do X and you're going to do Y and have the government or any other party say that. I guess I don't see that it's exactly on all fours with Glenn V. Tyson Foods when they're not telling people how much chicken they have to produce and who they have to give it to. Yes. Actually, Glenn V. Tyson has no ... The bottom line is, and that was the next thing I was going to get to, Watson requires subjection, guidance, and control, and also requires either a contract or a formal delegation. That's it. That's what it requires. There is no formal delegation in this case anywhere. There is no subjection, guidance, and control. There's no principal-agent relationship. None of the requirements of the Watson case are satisfied. This is an attempt to create a special ... That's why Tyson is so important. Tyson is an attempt to create a special relationship when there is no contract, no principal-agent relationship, and no ... If it's a government person telling them exactly what they're going to do, then they don't need a contract because they're much more intimately involved by being on the phone every day and checking on it. They don't need a formal contract. Was that happening or not? Is there a record support that there are facts to support that? What Mr. Kisler mentioned is the only instance that I know of where, and I'm not sure it's an instance that's really factual, but it's what he did testify to, but ... He was the person there on the scene at the time in charge of that group. He was a solicitor, but the record shows that what he was doing was enforcing a regulation. That's what he was doing. They had ... Can you distinguish the Seventh Circuit's 2020 decision in Baker versus Atlantic Richfield? Yes. I can easily distinguish that, Your Honor. In Baker, ISI had a contract, and also DuPont, the government actually built the plants for DuPont and leased them back to DuPont. There were contracts, and if you look at the case, the Seventh Circuit made the point, and they used the words to introduce a sentence about the contracts that ISI had. They said, most importantly, there was a contract between ISI and the government. Here, there was no contract between any crude producer and the government. Based upon the fact that you believe that the crucial thing is no contract, would we then be creating a circuit split with the Seventh Circuit if we affirm or are deepening an existing split, or do you think because it's so factually different that we don't have an issue with that? If you were to hold that there is federal officer jurisdiction in this case, there would not only be a circuit split, there would be a departure from Supreme Court clearly articulated law in Watson. There is absolutely no doubt, unless you have a formal delegation or a contract, that you don't have federal officer jurisdiction. The defendants in their briefing try to make an excuse. The excuse they argue is, well, we didn't have to have a contract because when Watson was decided, it was decided not on the basis that it didn't have acting under status because it didn't have a contract, but because it was producing a product that the government needs. Well, if that's the standard, if you produce a product that the government needs, then every military supplier is a federal officer. It's floodgates. Everybody's a federal officer. Well, I think that the distinction they're trying to make, and I'm not sure if the record supports it, is that there was such a degree of control and supervision that you didn't need the formal contract or the delegated authority, the official delegated authority, that the actual control and supervision is more than enough. Yes, that is the point they're trying to make. I will acknowledge that, and I cannot find one case that supports that. Well, assuming, arguendo, that actual control and supervision in such a strong way would be enough, are there facts in this record, or is it your position that there are not facts in this record? There aren't any facts. What they're talking about, Your Honor, are the directives. That's where they concentrate, on the federal directives, not this is the first time that we have all this concentration of what one man said in the deposition in one instance. They look at basically, and they do cite J. Howard Marshall in the briefing, but it's all based upon the federal directives that were issued, M68, 98B, PA011 are the relevant provisions, and all of those were basically federal directives that were regulations. If you look at a recent case, I think decided January 7th, Honolulu v. Suncor, which is another federal officer case, basically what it says is that directives under the War Powers Act, now under the Defense Production Act, are really regulations, and that's what really the bottom line of what they're relying on. In the record, Your Honor, there is an attempt by the defendants to make the point we didn't need a contract, and it's basically involved in three cases, the two rural electrification cases, Butler and Caver, and also the Enright Commonwealth case, which involves the criminal justice federal public defender. There weren't any private contracts in those cases, but in every case, every case, there was an agreement, a written agreement with the government. In the case of the co-ops, it was a loan agreement. In the case of the federal public defender, it was the grant agreement. But all of those written agreements contained federal controls. Where is the agreement that contains federal control? Where is the formal delegation? It's just not anywhere in this case. Well, they're arguing if there was the formal delegation, then they wouldn't have to argue there being a special relationship. And so what import do we make, if any, of the two amicus from the generals that were put in to try to underscore that there was this special relationship? Does that make weight? I mean, what? Not all close relationships are, open quote, special relationships under the Act. Watson is very clear. If you have a special relationship, and it says this, if you have a special relationship, it has to be based on a contract, or it has to be based on a formal delegation. There's nothing in the record, and Watson is very clear on the point, that Congress never allows a delegation to be made unless it's a formal delegation. You can't just collect a bunch of facts and say, hey, we have this special relationship. If that happened, we're going to have a lot of federal officers that we didn't know we had. This, none of this, the important point is here, what you're talking about, is that the relationship with the oil companies was not just to supply the military, and that's the point. The relationship with federal officers was to supply the, the PAW function was to take care of ensuring supply of oil to not only the military, but also the civilian population. Civilians during the war consumed 67% of the oil and gas in the country. It wasn't just for the military, and their attempt to portray that is really not factual. I don't understand what that matters, whether the most of it went to the civilians or the military. I don't understand the import of that. Well, the importance of it is that it was for the economy. The importance of it was that, first of all, we back up. What was the animus behind this removal? And that was, hey, they controlled the oil companies because they controlled access to steel. That's it. But the access to steel was not just to support the military. The access was to support the country and the economy from coast to coast. It didn't matter whether it was the military or the civilian population. And it was all done by regulations. And Judge Feldman makes a good point in his decision. The way you distinguish regulation that affects everyone from a specific delegation of federal authority is that federal authority is directed, for example, in the Winters case, which they rely on, it's directed at a particular entity or person, whereas the regulations are applicable countrywide. And so that is what we have here. These regulations apply across the board to all of the oil companies and all of the oil companies that were producing for civilian and military uses. There were regulations. I have two questions. One, I asked Counsel Oppsitt about the district court, and he said that an error that the district court made at page 14 was that the district court sought to reinstate the causal nexus status, which the last delay had prohibited. The same is in St. Charles Hospital, so I want you to comment on that. And then he also says, well, this is sort of the preeminent situation where they have a strong federal defense that part of this federal special relationship arising out of World War II needs to be in, quote, federal court and not in state court. So respond first to this reinstatement of the causal nexus. He says it was an error of the district court. That comment in Judge Fellman's opinion is taken way out of context. Judge Fellman used that example of a direct command as an example of what would have been, would have satisfied the acting under test. But throughout, Judge Fellman hewed to the Watson rules and to the rules of this court in terms of what's required to prove an acting under relationship. And I forget exactly what you asked, Your Honor. Well, the second I was just asking, he's saying, well, a strong federal defense needs to be in federal court emanating from this special relationship, et cetera, et cetera. So I'm just asking you to respond. Well, actually, to that point, the purpose of the federal officer statute is definitely to allow federal officers to assert their defenses in federal court. As a matter of fact, in the Willingham case, which is one of the older Supreme Court cases, and in Jefferson v. Acker, which was later in a concurring opinion by Justice Scalia, in those cases, the main point is that if you have, if a federal officer has immunity, that's why we have the federal officer statute. Here, we don't have that. There's no immunity claim. As a matter of fact, Judge Fellman said there wasn't an immunity defense in this case. But more importantly, the purpose of the statute, if you look back at the history that's set forth in the Watson case, was to prevent the interference of the government in operations, in federal operations. That's the purpose of the statute. It goes all the way back to the War of 1812 with the attempts to enforce the custom duties and tariffs during that time. And here, I don't see how finding an absence of jurisdiction in this case would allow interference with operations. You know, the amicus briefs contain some alleged facts of trying to give context for the situation. That's one problem with amicus briefs, is that sometimes they bring forward facts that are not in the record, and they haven't been Daubert tested or otherwise tested for accuracy through cross-examination and other methods. Do you dispute the things that are in these amicus briefs, especially the one that is telling us about how it all worked from the generals and that sort of thing? Do you dispute those facts as inaccurate, such that we shouldn't rely on those and that they're not part of the record? Do you understand what I'm saying? It's not necessarily an unfriendly question to you. It's sometimes people bootstrap facts that are not in the record through amicus. Well, I think the best way to answer that question is, and I can't get into each fact, but the best way to answer that question is those facts don't include a contract with the government and don't include a formal delegation. Okay, so you're not saying they're wrong. You're just saying it's not enough. Not enough. Okay. I mean, look, that's what happened in Tyson. Let's load the wagon with a bunch of irrelevant facts. If you don't have a contract and you don't have a formal delegation, goodbye. You're not in federal court. That's simple. That's what Watson says, and that's what this court has said. And to suggest otherwise that, oh, we have a – I don't think our law is that formalistic. Well, it's not that formalistic, but I can't find a case which does not have a contract, a principal-agent relationship, et cetera, or a formal delegation in the case law in this court. And that is – and the reason for that is that Watson absolutely requires it. And all I'm asking is that, you know, sure, I admit. Look, they had industry committees, but the industry committees were all advisory committees. Give him two additional minutes. The industry committees were advisory committees. None of what they did was compulsory. No one ever forced anyone to drill a well. This was all about cooperation, and it was unprecedented cooperation between the industries, but that typically happens during wartime. And that doesn't make a federal – if we're going to say that crude oil is a commodity, it's basically a commodity. It was a commodity during the war, and it's a commodity today, and it was a commodity before the war. If we're going to make every supplier of commodities to the military during wartime a federal officer, that's going to blow the statute completely out of the water. It's going to be a much broader interpretation than was ever intended by Congress. And Watson, Judge Breyer, goes through the history and tells you how – what the restrictions are. And the restrictions are you have to satisfy those requirements. Thank you. A lot of cash. What do you got? All right, you left time on the table. Mr. Marcello is going to take it, too. All right, you're back up for rebuttal. If I may, Your Honor, I'd like to address both the factual issues that my colleague from the other side raised at the beginning of his argument and the legal claim he makes at the end that there has to be a delegation or a contract for there to be removal. So first as to the factual issues, Mr. Marcello said it was apocryphal what Mr. Marshall said. I don't know on what basis he claims the sworn testimony was apocryphal, but certainly we are not relying only on that one incident. The Petroleum Administration for War History was the official government account which was published at the direction of Presidents Roosevelt and Truman by the government printing office. And it says on page 182, when violations of these orders occurred, the production division, that's of Paul, working with the chief counsel, developed all the facts and made a report to the compliance section of the war production board. But there are other industries that are regulated by the government where a violation of a regulation could result in a fine. Is that right? That's absolutely right. That doesn't equal control of the industry. That's right. I mean it doesn't equal you're a federal officer because there's a regulation. Right, because it has to be that other element of providing the government something it needs. We are regulated by the government today. We face fines, criminal prosecution if we do something wrong. But we are not providing something to the government the way we were during World War II. And the Paul history says the control. But you agree you're providing it to the government now. Well, but there's no. The industry is providing oil to the government. Well, and the electric industry is providing electricity to the government. All of that is going on. What has to happen is there has to be a case which calls into question as part of its legal claims your activities that you engaged in in the course of assisting the government and responding to its direction. It has to relate to that subset. But this case does. And to the extent there are any factual disputes, as I say, we think the record is overwhelmingly on our side. But the case of Baker v. Atlantic Richfield addresses that too. It says at this stage of the proceeding, because there is no trial yet, Your Honor, at this stage of the proceeding the Seventh Circuit said we credit defendants' theory of the case in deciding whether removal is appropriate. Because just like we don't prove our defense at this stage, we merely show that it's colorable, we have to show facts sufficient to say that we are entitled to try these issues in federal court. And by the way, Mr. Marcello said that the Baker case involved only government contracts. That's not correct. The court said there were both direct contracts between the defendants and the government, and also they were supplying inputs, as we were, to other companies that also had direct contracts with the government. So it was both the direct contractor and the subcontractor relationship. And as a legal issue, Mr. Marcello says there has to be a delegation or a contract. That is absolutely not the law. If that were the law, this Court's decision in Butler, the Eleventh Circuit's decision in Caver, both finding rural electric cooperatives had properly removed, even though there was no contract, no delegation. The Third Circuit decision, finding the community defender organization to be acting under, that would be wrong because there was no contract, no delegation. The language that he is referring to in Watson was a list of some of the relationships that will often, like contractual or employment relationships, satisfy the requirements for Federal office or jurisdiction, because if there is an employment relationship or a contract or assignment, usually the entity is helping the government by supplying an item the government needs of some sort, and so usually it will satisfy it. But that was not an exhaustive list, and that's why, Judge Stewart, the Court did make that reference at the end. There just needs to be some such special relationship which satisfies these requirements. Here we have all the hallmarks of that special relationship, in particular supplying a good that the government used to conduct a war. And if there were a requirement that there be a contract, we meet that too, because we were clearly subcontractors under the definitions that were operative during World War II. And, Judge Stewart, you asked what other errors we would point to with respect to the district court decision. The district court said that we were to subcontractor because we didn't take over a portion of the prime contract. The definitions during World War II were much broader than that. They said that would be one instance if you perform the work or if you furnish an article that is necessary to the requirements of the contract and then incorporate it into the end product. And obviously crude oil was the essential item required here. So under the World War II definitions, and look, the definitions of subcontractor change over the years depending on what the government perceives to be its needs for a particular era. During this era, they wanted the broadest possible definition of subcontractor because they needed to assert control over the entire district. But you're arguing that the actions were tantamount to there having been a subcontracting relationship? It's more than that, Your Honor. We have not found a specific subcontract from 80 years ago that we can produce for the record. But there's no evidentiary requirement of that. If you're on a look at page 16237 of the Record on Appeal, there is a specific reference in a report by the Industry Committee that there were contracts of supply that were in the process of being consummated. So we know there were contracts of supply. We just don't have the actual contract. There's no requirement that we produce the specific contract. And in any event, the regulations that we're citing, as I said, they were broad. They say there just needs to be a contract or purchase order. And obviously there were purchases. But at the end of the day, we don't rely, we don't think we need to rely on the subcontractor relationship because, as I've said, Mr. Marcello is incorrect when he says that you can only get federal officer removal if there is either a contract or delegation. In Philip Morris, the whole reason the Court mentioned delegation was that Philip Morris wasn't giving the government anything. It was just selling its cigarettes to the public. So it had to find some other argument for why it could be acting under. So it said this thing about how it was formally delegated authority. And the Court said, no, you weren't. There was no evidence of delegation in the record. But that was because Philip Morris couldn't get to first base on what is the principal rationale for federal officer, which is are you assisting the government in some direct way in acting under its control? And if the Court has no further questions, I thank the Court. All right. Thank you, both sides, for a robust briefing in the oral argument.